You may have counsel for both sides. Make sure you speak up and into the microphones. Good morning, inmate. Please, the court. My name is Ranjana Natarajan, and I represent plaintiff and appellant Jacqueline Smith. Seems to have calibrated very differently now. I apologize. Do your best. Harris County failed to make reasonable accommodations as required by the Americans with Disabilities Act to provide Denarion Hawkins the benefit of safe confinement, to which every inmate is entitled. And as a result, Denarion died tragically by hanging. The district court erred by granting summary judgment to Harris County. Plaintiff's claims should have gone to a jury because a reasonable jury could have decided, based on the evidence in the record, that the issues and the facts did amount to liability under the ADA. The district court incorrectly held that four of the six reasonable accommodations that plaintiff asserted were in fact the result of medical decisions, which was incorrect. With regard to three of the reasonable accommodations, suicide blankets, suicide-resistant cells or cells without protruding smoke detectors, and more frequent monitoring, record evidence showed that those three accommodations could be and had been made by jail classification and jail custodial staff, and in fact were not impacted or the result of the psychiatrist who released Denarion from the mental health unit. Let's step back for a moment. This case was brought under Rehab Act and the ADA, right? That's correct, Your Honor. Not the Eighth Amendment. That's correct, Your Honor. So the standard we're looking at is not deliberate indifference, which is itself not an easy standard for plaintiffs. It's intentional discrimination. That's correct, Your Honor. So talk to us about how this is intentional discrimination, because my understanding of the record is Harris County did provide various treatment services. It just obviously tragically didn't provide enough to prevent what happened. How is that intentional discrimination? Intentional discrimination, this Court has said before that intentional discrimination is not the same as deliberate indifference under the ADA and also does not require a showing of willfulness, malice, or animus under the ADA. What the Court has said, for example, in Dellen, Ohio, is that if the officer or the official repeatedly tries the same technique, realizes it's ineffective, but then does not attempt to adapt, that's enough to show intentionality. So most recently in Cadena v. El Paso County, there was a detainee who requested a wheelchair. The reasonable accommodation was the wheelchair because she had just come out of surgery. The doctor had prescribed her a wheelchair. She came into the facility, they gave her the wheelchair, then they took it away. They gave her crutches instead and said, you have to manage on crutches. And she repeatedly asked to get a wheelchair, and they repeatedly refused. To me, it's much easier to find evidence of intentional discrimination. When someone's asking for something, you know they want it, and you're saying, no, I'm not going to give it to you. Here, these accommodations were never requested. You're saying they should have been open and obvious, the need for them. But it just seems very difficult to prove intentional discrimination for not giving someone an accommodation they never requested. Do you know of any case like that where it was allowed to go forward on discriminatory intent? Well, the case law and the standard is that if it's open, obvious, and apparent, then there needs to be no need for requesting the accommodations. And so there are three district court cases that we've pointed to, McCoy v. TDCJ, McCollum v. TDCJ, I believe Wright v. TDCJ, where there was no deliberate request for accommodations, but the need was obvious. Here's why the need was obvious in this case. This is not a close case where you had someone with serious mental illness who had never tried to commit suicide before. He had tried to commit suicide in this jail eight times. Ten months before, in exactly the same manner, in exactly the same pot of the jail, using his bed sheet to tie a noose and tying it to the protruding smoke detector. It was obvious. I mean, it was, you know, repeated instances. I understand that. But if I'm a prison guard, a jail guard, and I know he was in the mental health unit recently and was looked at for all these problems, and the doctors there said, okay, you can go back into the regular population, why would it be open and obvious to me that he still needs all these accommodations if the doctor said we don't need him in the mental health unit anymore? Here's what the jail's own 30B6 witnesses testified at deposition that I think answers that question. They said, suicide prevention is everyone's responsibility at the jail, and jail policy requires everyone to be continually visually monitored. Vigilant observation is what they call it. And they do it through direct observation so that I in the pod control center look directly out at the inmates and can view them. That was the way that they did that. And so what they said was, regardless of what the doctor said, everybody's duty was to make sure that they would prevent suicide. And the jail classification official testified that they were aware of his prior incidents, including all the suicide attempts. They were aware that he was being treated by the psychiatrist, and it was their responsibility as well as the doctor's responsibility to monitor for suicides. Suicide attempts didn't only happen in the mental health unit. In fact, they more often happened in general population. That's why all the custodial staff were trained and were required by policy to constantly be vigilant. And so they could have offered him a suicide blanket, as they had done previously. Now, we call it a blanket. They call it a smock. Their own policy has called it both things. But it's a piece of clothing that you can't use to make a knot or to tie a noose out of. And the same thing, Major Martin, their 30B6 witness, said everybody in the jail, every custodial staff, could order more frequent monitoring of an inmate if they were worried about him, even constant observation, just one-on-one, sitting across from the inmate. So all of those three accommodations were available regardless of what the psychiatrist said. It wasn't true. This might have been a sort of tactical matter for Harris County to argue that we're allowed to rely on the medical judgment. But as a practice, both 30B6 witnesses said that's not in fact what they did. Jail classification made its own decisions with regard to where they put someone in a cell, what restrictions there were. And if the doctor tried to order some restrictions, jail classification says we don't look at those. You don't have our entire file. And that officer, Major Summerlin, said they only have a psychiatric file. They don't know everything. We make the decisions on where to place someone in the cell and what those restrictions should be. What does the record reflect about why he was put in a cell by himself? I mean, he was alone in that cell. There weren't any other inmates in the cell with him. And it's occurred to me, I mean, if there had been someone else there with him, this thing would never have happened because someone would have raised an alarm. So what does the record reflect the pros and the cons are of putting him in a cell by himself? Your Honor, our psychiatric expert did in fact testify to how for someone with chronic suicidal risk, putting them in a suicide-resistant cell is very important. And that has been defined as either a cell that has no protuberances, if it's a one-person cell, or sometimes it can mean an accommodation of having someone else in the cell. The record evidence here is that they placed him in that cell because he had had previous disciplinary incidents. But also, regardless of whether he was in that cell or not, nothing prevented them from modifying that smoke detector or making sure that he had a suicide blanket, either one of which would have saved his life. Just like if they had made sure, as their policy required, that the cell window was not covered for minutes on end, that would have saved his life because the officer looking straight across from his cell would have seen into it and seen the noose. In fact, that's exactly what had happened ten months before. They had seen the noose, immediately gone in and taken it down and saved him. And they weren't able to do that because they didn't follow their own policy. And what we're saying about the reasonableness of these accommodations is this. How can we call accommodations not reasonable when they're required by their own policies? I have one other question about the intent. In deciding if there's enough evidence of intent, is it collectively? I mean, there's so many people working in this jail. You've got the doctors, you've got the guards, guards on different shifts, people at the control command center who have the video monitoring. I know there's vicarious liability under the ADA, but it seems in the typical ADA case, you have a supervisor who fires someone or refuses an accommodation, so you're focused on that supervisor's intent. How do we look at the intent here? So I think two things are important in that respect. One is, as you noted, there's vicarious liability, and so the county is, in fact, liable for the actions of all of its employees, including its contractors. There's no question about that. The case law makes that clear. And so the question is, looking at the course of conduct. But do you have to find at least one person in that jail who had discriminatory intent against your client because of his mental health problems? So I think we have to find that they were on notice, had actual notice of his disabilities and the need for the accommodations, which we say they were, and they had to know that their management of Denarian was ineffective. And the best evidence that it was ineffective was that every time they put him back in a cell that wasn't suicide-resistant and where they didn't give him a suicide blanket, he kept trying to tie a noose. So which employee had that discriminatory intent? It was a combination of jail classification staff, jail custodial staff, and the ADA doesn't require us to point to one individual who had the knowledge of that intent What's the best case for that? Let me come back to you on rebuttal and I will provide a case for that. But I will say all of the case law I mentioned earlier, so Cadena, Perez v. Doctors' Hospital, Delano Pyle, Moralia, those are cases about intentional discrimination. And it so happens that in Delano Pyle it's one officer, but in Perez v. Doctors' Hospital it's a number of doctors that are managing the care of a deaf patient. They give one communication device, it doesn't work, and then they never try something different. So I think even that plus Cadena stands for the proposition that you don't have to identify one particular person who had all the knowledge under the belt. And if that were the case, then you could probably not attach liability for these kinds of jail ADA violations ever, because jails, of course, do disperse their responsibilities among several layers of employees. And I don't think that would be the intended result under the ADA. So I'd like to go back to the other three reasonable accommodations we discussed. One was Chelsea Ford's failure to refer Denarion to a psychiatric follow-up immediately after he made a suicidal statement, where he said the Illuminati is watching me and makes me want to kill myself. She admitted at deposition she knew he had serious mental illness, she knew he had tried to commit suicide, she knew that was a suicidal statement, and she knew that he had previously had suicidal ideation. She knew also that policy required her to immediately refer him to a psychiatrist. We pointed to both jail policy as well as policy for her immediate employer that said she was required. So although there may be instances where doctors should not be liable under the ADA for reason of medical judgment, in this instance, the jail stripped her of that capacity. They said, we want you to apply your medical judgment, but not when it comes to this. Suicide prevention is too important. Any time you hear behavior indicative of a mental health issue, the jail policy said you must report it right away. She admitted that she didn't. She had no discretion not to report. So that's not true. The problem, again, as we mentioned earlier, was that he had been turned loose by the psychiatric unit, and so, you know, recently, what was the difference in time between when he was turned loose and when she heard these comments? He was sent back to general population on January 31st, and she heard this statement on February 4th, and he killed himself on February 5th. So, I mean, she could at that point have thought, as I think other people did, that he'd been cleared, quote, unquote, by the psychiatric unit, and therefore she was more willing to think that this really wasn't a problem. That's the sort of human response. That's a fair question, Your Honor. Policy required her to report that statement for psychiatric follow-up because the jail had decided as a policy matter that suicide prevention was too important for those kinds of incorrect judgments. It was just too important to make that mistake, number one. And number two, in practice, even after Dr. Huerta had released Denarian back to general population, jail staff continued to be responsible to vigilantly observe him face to face and to provide him whatever requirements he needed to make his confinement safe. It wasn't an on-off switch at the jail where the only thing that jail staff could do was refer him to a psychiatrist. There are some jails like that. Harris County didn't operate that way. Harris County said, when you're in general population, you can have a suicide blanket. We can give you more frequent monitoring. The reason was because they had had so many suicides, they knew how to prevent them and what was effective. It didn't happen in this case because they weren't even close. Thank you. I see my time's up. All right, you've saved time for rebuttal. Ms. Hedge. Thank you. May it please the Court, Laura Beckman Hedge representing Harris County. First, I would like to begin by addressing some of the questions that the Court had that I think are important for me to address. And the first one I'd like to begin in involvement is with regard to the intentional discrimination claims. The Court was very focused on who has to show intent here. And I want to point out that the two critical areas that have been criticized by appellants is Chelsea Ford, the mental health professional that saw Mr. Hawkins the day before he killed himself, and the jail classification staff. When you read their briefings, those are the two areas that they complained about. They say that the classification staff intentionally housed him in an unsafe cell. And what I want to point out about that first is that the classification staff, when a doctor discharges an inmate to general population, that is without any restrictions at all. There's no suicide precautions, and there's no restrictions placed on that individual, and the doctor knows that. And that's exactly what happened in this case. Denarian Hawkins had been in the mental health clinic for two weeks, and he entered there because he had tied a bed sheet to his neck. He was out for his hour out, and he was standing on the second level, and he tied it to a railing. He hadn't done anything more than that, and jail staff saw that and immediately said, we've got to get you down to the mental health clinic. Importantly, only a doctor can admit or discharge from the mental health unit. Are you saying there's no middle ground? You're either in the mental health unit, or if you're out in the regular population, there's nothing that can be done to deal with a potential suicide threat? Actually, there is something that can be done and something that has been done repeatedly with Mr. Hawkins. And what that is, if an inmate indicates by suicidal gesture or statement or plan, what they can do is take that inmate, they remove his clothes, they give him a suicide smock, and they place him in a cell where he cannot arm himself. Now, they do that, and then they give him a suicide watch where they can go and they look at him every 15 minutes. And he had that? They have that. But this was done here? Well, in this particular instance, this was not done. And the reason it's important because— What was the monitoring required here, then, not every 15 minutes? So the monitoring here was every 25 minutes. What's really critically important here is there has to be a trigger for suicide watch. You don't put every inmate in general population under suicide watch. How about an inmate who's had about eight suicide attempts? Yeah, I mean, how many more attempts does it take before the jail is on notice that this guy is a suicide risk 24-7? Well, and, Your Honor, that is why they have psychiatrists on duty 24 hours a day in that jail, that if there is any indication to any jail personnel that there's an inmate acting in a way that they think may be suicidal or some other mental illness, they do a psych referral to tell the mental health doctor, You need to see this person. And they take precautions by putting them in a suicide smock and giving them 15-minute observation periods until they can be admitted. Doesn't the record reflect here that this individual had a history in the jail of being a continual suicide risk? I mean, what more does it take to be viewed as a suicide risk with the history this man had? Well, with respect to suicidal risk, I mean, it's a temporary infliction. And it's not something that you can see. And the mental health doctors, they are specially trained to be able to tell when an inmate is not at high risk of harming themselves. They will hold them in the mental health clinic. That's why it requires a doctor's discharge to get out of the clinic. And with Mr. Hawkins, Dr. Huerta, he evaluated, he had been in there for two weeks, and he was on a very high level of precaution when he first went in there. And as the two weeks went by, with the medication he was given and the treatment he was receiving, the precautions slowly got reduced to the point that that doctor said he is not at risk of suicide. And that's in his testimony. He did not feel that Mr. Hawkins was in harm's way when he said he can go back to his cell, he can go back to getting his clothing, and he can go back to having monitoring every 60 minutes. Now what's important here, to go back to the classification staff, they do know that this guy has a history of suicide. They've seen it in the records. They don't have access to his mental health records because of HIPAA violations, so they don't know his diagnosis, and they don't know the details. But they do have access to the jail records. And what's important is that classification staff, they didn't assign him to the 60-minute observation. They actually assigned him to even more monitoring every 25 minutes. When you're put in administrative separation where these single cells are located, and they're for violent offenders, and he was one, the assaulted staff and inmates, when they are put there, not only do they get increased monitoring every 25 minutes, which exceeds state requirements, he also is seen bi-weekly by a mental health professional. And that's what Chelsea Ford was doing on that day before he killed himself. She is there to evaluate these inmates. That's why, because you're going to have inmates in these separation cells that are going to have mental health issues. And so that's her job, is to see them twice a week to see how they're doing. And the day before he killed himself, she saw him, and he verbalized to her, the Illuminati is watching me and telling me to kill myself. And she said, well, are you feeling suicidal right now? You know, and he said, because she knew this guy. She had been coming to this particular cell block before and was familiar with this inmate. And she said she knew about a prior suicide attempt that he had made. And she said, are you feeling suicidal right now? He said yes. And she said, will you tell me if you start feeling that way, if your symptoms worsen, will you let me know, will you let the jail staff know? And he said yes. And so she evaluated that. That's her job. And she said, you don't need to go see the mental health doctor. Now, was that the best decision that she made? Plaintiff's expert was saying no. She should have done more. What happens says no, but you don't need an expert to say that was a bad decision. But, I mean, look at the tragedy that occurred. But the district court threw out the case, finding that all these accommodations were medical decisions that aren't actionable under the ADA. Why is giving someone a suicide-proof blanket, why is that something only a doctor can take care of? Well, with respect to the suicide blanket or the suicide smock, the jail staff can put somebody in one if they think this individual is suicidal. But importantly— Without a doctor needing to approve that, right? The doctor does not need to approve it. Now, you cannot leave that inmate in a suicide smock indefinitely. It is cruel and unusual we'd be here on a different lawsuit if that were the case. Because you have to use the least restrictive means necessary. And so, with regard to a suicide smock, that is only meant to be temporary. In fact, Dr. Conrad, a Pelham's expert, they testified, and Mr. Upchurch as well, the jail expert, they acknowledged that the bedding and the clothing are only temporary. They're not meant to be permanent. And so, with respect to Mr. Hawkins, when Chelsea Ford saw him, she said, he doesn't need a suicide blanket. He doesn't need to go to the mental health unit. And importantly, because we want to go back to the intentional— But why is it classified as a medical decision? You know, whether to give someone medication, obviously that's a doctor's decision. But why is giving someone the blanket treated as a medical decision? Well, in this—I mean, if we look at the snapshot in time that's important here, which is February 4th, 2014, when Chelsea Ford saw him, she's the one that made the decision that he didn't need to be seen by anybody else and no precautions needed to be taken. Whether it be a suicide blanket, whether it be going down to the mental health clinic, whether it be constant observation, she did not ring the bell that said, he needs to be on suicide watch. She didn't tell the jail staff. They did not know. The evidence is undisputed in this case that no jail staff knew that he was suicidal at the time that he killed himself. The other point I'd like to make, and this goes to the intentional discrimination issue, Dr. Conrad, he commented specifically on Chelsea Ford and said, I don't think she deliberately did anything. He thought she made bad decisions, but he didn't find that she was even deliberately indifferent, which I know is even a lesser standard than intentional discrimination. Another issue that I'd like to raise for the court is this idea of the reasonable accommodations that they have complained about. One of the accommodations they're saying is that the towel that was up over the window, that jail staff violated policy and they should have removed it. But the evidence in the record is uncontroverted, that when the last officer on the second shift did their rounding at 9.53 p.m., which was 17 minutes before Mr. Hopkins committed suicide, there was not a towel covering that window. He testified, that Officer Perkins testified, if there had been a towel there, I would have told him to take it down. There wasn't a towel up. When the next officer came on, the next shift started at 10 o'clock, so that was at 9.53. At 10 o'clock, Christopher Cano, he was the detention officer doing rounds, he started his rounds at 10.02. By 10.10, he was in front of Mr. Hopkins' cell and saw a towel up. He immediately knocked on the window because it's against policy for inmates to cover their window. He knocked on his window, didn't get a response, lifted up the panhole and saw him hanging and immediately took action. Unfortunately for Mr. Hopkins, it was too late. In that 17 minute time period, he had time to kill himself. But there's not any evidence that the officers did anything to violate any policy. And that's important because it goes back to this intentional discrimination issue. Now, the issue that the court decided, the district court found, that this was a medical treatment decision by both the doctor and Chelsea Ford. That the doctor, in discharging without restrictions and without precautions, that that was a medical treatment decision. And jail staff should be allowed to rely upon the judgment of a mental health professional like Dr. Huerta. And they did. Now, with respect to Chelsea Ford, he found the same thing. That it was her decision, her professional, she's a licensed professional counselor, it was her professional opinion that he was not suicidal. And so, when you're looking at how can there be intent to discriminate against Mr. Hopkins, there is no intent. There's not even deliberate indifference here. The classification staff assigned him based on the recommendation of Dr. Huerta. Additionally, the idea of suicidality. It's not open and obvious that someone is going to kill themselves. Now, in that last year and a half, when Mr. Hopkins was in the jail, from July 2012 to February 2014, he attempted suicide three times. The first time was in April of 2013, and that's when he attempted to hang himself. The next time after that was, I believe, July of 2013, where he had stored his pills and he attempted to overdose. He went to the hospital for a month and came back to the jail and was under the care of the doctors there until they discharged him, finding him to be stable. And then, again, we know January 17, 2014, which is what led to him being in the clinic for those two weeks. But the point is that there are going to be inmates in the Harris County Jail that are going to have mental health issues, and Harris County has an extremely good record for suicide rates in the jail. We would prefer to have no suicides. That would be the best. Nobody wants to have suicides in their jail, but if you look at the national statistics, they are doing really well. In terms of having low numbers based on the number of inmates that go through that jail. And that's because those officers are trained that when they see something, they do something. In this case, the officers didn't see something or they would have done something, and that was their testimony. All right, I think we have your argument. Thank you, Counsel. Thank you. We'll hear rebuttal. If you want to address one of the points she made toward the end, again, going back to intent, there's all these instances, not just when they found him when he did commit suicide, but all these other attempts. The staff repeatedly rescued him, attempted to rescue him in the final incident. They're giving him mental health treatment. Isn't that inconsistent with saying they were discriminating against him because of his mental issues? The intentional discrimination standard under the ADA is just different from what it is under 1983. And so that's why I think it looks and feels so different. It's not about whether they were generally providing him medical treatment or not. It's true. They were medicating him with antidepressants as well as antipsychotics because he had been diagnosed with psychotic disorder and schizoaffective disorder, and they knew he had auditory hallucinations. All of those things are true. The question is, was the failure to make reasonable accommodations, did that show evidence of intentional discrimination? You said it's not like other 1983. It's also, though, not like most failure-to-accommodate cases because typically under the ADA, a failure-to-accommodate claim does not require intent. It's just, was it requested? Was it a reasonable accommodation? In the employment context, for example, if someone at work says, I have this disability, I need this accommodation, that's not an intentional discrimination claim. Here the problem is you're going under this title that actually doesn't have accommodation language, but I guess the courts have, it requires intentional discrimination for these public access claims, but the courts have read in an accommodation requirement, and so you have intent with an accommodation, which isn't how the ADA normally works. So there's no question that a failure-to-make-accommodations claim is viable under Title II of the ADA. What the intentional discrimination standard on top of that tells us is that the defendant had to be on notice of the disability and the need for accommodations, and what the Fifth Circuit case law tells us is how we look at that is, did they have information that told them that their management methods were ineffective? And in this case they did. They tried to manage him in ADCEP without a suicide-resistant cell. They got information back from him that it was ineffective because he kept trying to commit suicide over and over. That was what showed them it was ineffective. So then the court looks at, was there an attempt to adapt? I'm using language from Cadena here. Was there an attempt to adapt? And here there was no attempt to adapt. And actually Chelsea Ford is the perfect example of this. She treated a suicidal statement that she agreed at deposition was suicidal, and what she did was she minimized its risk and decided not to report it, even though she had no discretion to do so. So that's the opposite of the attempt to adapt, to say, hey, it's not working. Let's make sure we do more for him to prevent a suicide because it's getting more and more frequent that he's trying to kill himself, which is in fact what the record shows. I want to make one point. We didn't need to win this case. This was a summary judgment motion. We just needed to put in enough facts to show that there was a genuine issue of disputed fact. And what we wanted to point to this court, too, was there was ample evidence on each of these six accommodations. Two of them had nothing to do with medical decisions. The district court said so, too. The towel and the 25-minute monitoring. But the district court said there was no admissible evidence. Well, we had admissible evidence based on the jail policies, the testimony of their 30B6 witnesses, and the testimony of Dr. Huerta and Dr. Ford. Dr. Huerta said, this is not my territory. I'm not allowed to do anything for inmates in general population. I tried to once. They told me to step off. And so he wasn't able to put any restrictions on Denarian, and there's no dispute in the record about that. But even if there was a dispute in the record about that, we should get to have a jury look at that evidence, weigh it, because it is reasonable that a jury could find for the plaintiff on these issues given the amount of evidence that we had used. May I address one last point? Sure. Which was the question you asked about intentional discrimination and do we have to identify someone. In addition to the cases we pointed out, I would just go back to Frame v. City of Arlington. This is not a municipal liability standard under 1983, and neither is it an individual capacity standard under 1983. And if you look at Frame, it just says the city knew. The city was on notice. The city understood. Similarly, most recently in Cadena v. El Paso County, the county knew. And so it's okay that one employee didn't know everything because the county is presumed to have the knowledge of all of its employees. Now, as a factual matter, Ford knew everything. Classification staff knew everything. That's in their depositions. But I wanted to just answer that question. Knowledge is a little different than intent. I mean, there's a lot of areas of the law where we say, were they on notice, and yes, you can look sort of collectively at that. That's a little different saying they're on notice than saying they wanted to discriminate against this person because he has a mental health issue. So if we're looking for people, they're there. Aguirre, the officer who was with Kano, was in the pod control center for 10 minutes. He admitted, I know the policy, I'm supposed to be watching inmates at all times. He admitted he had been in ADCEP before. Kano knew that Denarian had tried to kill himself before, and he sat there for 10 minutes, he saw the towel, and never asked him to take it down. Ten minutes can mean life or death when it comes to people who are hanging. So we think there are more than enough people in the record based on their own testimonial evidence and the jail policies that show adequate knowledge for intentional discrimination. All right. Thank you. The case is submitted. Thanks to both sides for the helpful arguments. That ends today's docket, and the court will be in recess.